UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
HERBERT FEINBERG, individually      :      99 Civ. 0045 (CSH)
and as assignee of I.A. ALLIANCE
CORP., f/k/a I. APPEL CORPORATION,   :
           Plaintiff,              :

      -against-              :

                                 CONSOLIDATED CASES
STEPHEN KATZ and NORMAN KATZ,   :

           Defendants.           :

-------------------------------------------------------X
HERBERT FEINBERG, as Assignee of    :      01 Civ. 2739 (CSH)
I.A. ALLIANCE CORP., f/k/a
I. APPEL CORPORATION as Assignee   :
of the Claims of Creditors
of I. APPEL CORPORATION,          :      MEMORANDUM OPINION AND ORDER

           Plaintiff,            :

      -against-             :

NORMAN KATZ and STEPHEN KATZ,   :

           Defendants.           :

-------------------------------------------------------X

HAIGHT, Senior United States District Judge:

      These consolidated cases involve the continuing litigation in this Court between plaintiff

Herbert Feinberg and defendants Norman and Stephen Katz (sometimes collectively "the Katzes").

The cases are before the Court on the defendants' motions to dismiss both complaints.

## I. PROCEDURAL HISTORY

      The prolonged litigation between the parties need not be recounted in full. For the purpose

1

of these motions, it is sufficient to say that in happier times, Feinberg and Norman Katz ("Norman") were friends and 50/50 co-owners of an apparel manufacturer, I. Appel Corporation ("I. Appel"). In 1996 Feinberg and Norman entered into an agreement by which Feinberg purchased Norman's 50% interest in I. Appel. The purchase agreement provided that certain specific issues would be subject to arbitration. An arbitration covering several disputes took place. The arbitrators rendered their award on November 22, 1999. On cross-motions to vacate and confirm the award, this Court vacated that portion of the award which undertook to place a valuation on the business of I. Appel in order to determine the purchase price Norman should be paid by Feinberg, and confirmed the award in every other respect. 167 F.Supp.2d 556 (S.D.N.Y. 2001). The Second Circuit affirmed *per curiam*. 290 F.3d 95 (2d Cir. 2002).

On January 5, 1999, before the arbitrators rendered their award in the arbitration between Feinberg and Norman, Feinberg in his individual capacity and as assignee of I.A. Alliance Corporation ("Alliance"), the corporate successor of I. Appel, filed in this Court the action bearing docket number 99 Civ. 0045 against Stephen Katz ("Stephen"), Norman's son. The complaint asserted a claim of common law fraud arising out of Stephen's alleged misappropriation of I. Appel's assets and falsification of its financial statements.

On January 31, 2000, after the arbitrators had rendered their award but before this Court issued its decision vacating the award in part and confirming it in part,[1] Feinberg and I. Appel filed an action in this Court bearing docket number 00 Civ. 0017 against the Katzes and one Jose Peschard. That complaint alleged that the three defendants breached their fiduciary duties to I. Appel and misappropriated the company's assets and business opportunities by scheming to take over one

---

[1] That opinion was dated April 11, 2001.

of the company's Mexican subsidiaries ("the Mexican Scheme").

On March 30, 2001, also before this Court issued its opinion on the arbitration award, Feinberg, as assignee of the claims of Alliance's creditors,[2] filed an action in this Court bearing docket number 01 Civ. 2739 against the Katzes. That complaint asserted causes of action for breach of fiduciary duty and fraud for allegedly disguising the company's true financial condition from its creditors.

After this Court issued its decision vacating the arbitration award in part and confirming it in part, the Court consolidated the three captioned cases for all purposes in an order dated June 26, 2001. The Katzes agreed at that time to allow Feinberg (in his several capacities) to amend all three complaints, in order to delete allegations and claims that would have been barred by collateral estoppel as a result of the arbitration award as confirmed in part.

In consequence, the complaint in 99 Civ. 0045 was amended to delete certain claims and incorporate some of the claims in 00 Civ. 17. The amended complaint in 99 Civ. 0045 alleged six causes of action, including a RICO claim, by Feinberg individually and as assignee of Alliance, against the Katzes and Peschard. The practical effect of that amended pleading was to render the complaint in 00 Civ 0017 obsolete, because the amended complaint in 99 Civ. 0045 was reconfigured to incorporate the claims alleged in 00 Civ. 0017. The complaint in 01 Civ. 2739 was amended to allege fraud, RICO and breach of fiduciary duty claims by Feinberg as assignee of the

---

[2] I. Appel filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, in April 1997. The bankruptcy court approved the company's disclosure statement in February 1998 and its first amended plan of reorganization in May 1998. The plan provided that Alliance, the corporate successor of I. Appel, was entitled to assert all claims held by its creditors as of April 30, 1997. The bankruptcy court issued a final decree and closed the case in November 1999. In June 2000, Alliance assigned the creditors' claims to Feinberg.

3

claims of I. Appel's creditors.

Defendants moved to dismiss the amended complaint in 99 Civ. 0045. In an opinion reported at 2002 WL 1751135 (S.D.N.Y. July 26, 2002), the Court granted the motion in part and denied it in part. Specifically, the Court inter *alia* dismissed the RICO claim against the Katzes with leave to replead; dismissed without leave to replead a claim for indemnification or contribution from the Katzes for legal fees and settlement costs incurred by Feinberg in an unrelated litigation; excised from the complaint any claim based upon the Mexican Scheme because Feinberg lacked standing to assert it; and denied the motion to dismiss claims for breach of fiduciary duty, conversion, unjust enrichment and constructive trust, subject to certain limitations imposed upon those claims by the Court's opinion and order.

Plaintiffs filed a second amended complaint in 99 Civ. 0045. It alleges five claims for relief: first, a RICO claim against Stephen Katz only; second, breach of fiduciary duty against both Katzes; third, conversion against Stephen only; fourth, unjust enrichment against Stephen only; and fifth, constructive trust against Stephen only. The Katzes now move to dismiss this second amended complaint.

Feinberg, as assignee of Alliance, the assignee of the I. Appel/Alliance creditors,[3] filed an amended complaint in 01 Civ. 2739 against both Katzes alleging five claims for relief: first, common law fraud; second, RICO; third, breach of fiduciary duty; fourth, constructive fraud; and fifth, fraudulent conveyance. Defendants also move to dismiss this complaint.

One additional chapter in this procedural history must be written, because it bears upon the resolution of the defendants' pending motions to dismiss the complaints. When I Appel filed its

---

[3] See fn. 2, *supra,* and fn. 7, *infra.*

Chapter 11 petition in the bankruptcy court, it did not specifically describe in its schedule of assets the claims now asserted by Feinberg individually and as assignee of Alliance and the Alliance creditors against the Katzes in the actions in this Court. The Katzes took the position that this omission barred Feinberg and Alliance from asserting such claims in this litigation. Seeking to defuse that defense, I. Appel/Alliance returned to the bankruptcy court in its revived role as Chapter 11 Debtor and asked that court to reopen the Chapter 11 proceeding for the purpose of allowing the company to amend its schedule of assets to include the specifics of the claims against the Katzes. In January 2003 Bankruptcy Judge Drain, by an undated order and over the Katzes' objection, granted that relief. On appeal, District Judge Marrero affirmed Judge Drain's order. *In re I. Appel Corporation*, 300 B.R. 564 (S.D.N.Y. 2003). The Second Circuit affirmed Judge Marrero's ruling by summary order. 104 Fed.Appx. 199, 2004 WL 1496858 (2d Cir. July 1, 2004).

## II. THE PRESENT MOTIONS

Since, as noted in Part I, the complaint in 00 Civ. 0017 was incorporated into the amended complaint in 99 Civ. 0045 and essentially vanished off the litigation's radar screen, the briefs of counsel are limited to the defendants' motions to dismiss the amended complaints in 99 Civ. 0045 and 01 Civ. 2739. I will describe these motions separately.

**A.    The Grounds Urged for Dismissal in 99 Civ. 0045**

In this case, in which Feinberg appears as a plaintiff individually and as assignee of Alliance, the Katzes based their motion to dismiss the complaint on two arguments.

The first argument is that Feinberg has no standing to bring the asserted claims in his individual capacity, because a shareholder in a corporation does not have standing to assert or collect upon claims alleging wrongs to the corporation. The Katzes' second argument, focusing upon

5

Feinberg's status as assignee, is based on the premise that when Alliance filed its Chapter 11 bankruptcy petition, the corporation wrongfully failed to include its claims against the Katzes in its list of assets or disclosure statements, with the consequence that "Alliance -- and its assignee Feinberg – are estopped from asserting them in this lawsuit." Main Brief at 13.

**B.     The Grounds Urged for Dismissal in 01 Civ. 2739**

In this action, Feinberg does not sue in an individual capacity, but rather as the assignee of the company's creditors. In support of their motion to dismiss the amended complaint, the Katzes make four arguments: first, that as the result of Alliance's failure to disclose its claims against the Katzes at the time of the company's bankruptcy filing, the creditors' assignment of their claims to Alliance and Alliance's assignment of those claims to Feinberg are invalid; second, that claims arising out of I. Appel's 1955 financial statements[4] are barred by collateral estoppel because the claims "implicate[] an issue that was litigated and decided in the Arbitration," Main Brief at 14; third, that *vis-a-vis* the company's creditors, the misappropriations alleged principally against Stephen Katz were not material and did not cause them damage; and fourth, that the amended complaint does not sufficiently allege a claim under RICO.

**C.     The Effect of the Second Circuit's Bankruptcy Decision on These Motions**

The Katzes' motions to dismiss these two cases became *sub judice* in this Court at about the time the I. Appel/Alliance application to the bankruptcy court to reopen the case in that court for the purpose of amending its schedule of assets to include claims against the Katzes was wending its way to Bankruptcy Judge Drain, from him to District Judge Marrero, and from him to the court of appeals. In those circumstances, I advised counsel that this Court would defer decision on the

---

[4] *See, e.g.*, amended complaint at ¶ 35.

6

motions until the Second Circuit had decided that appeal.

As noted in Part I, *supra*, the Second Circuit affirmed the rulings of Judges Drain and Marrero that Judge Drain's order granting reopening of the bankruptcy case for the indicated purpose was well within his discretion. I directed counsel for the parties to submit supplemental letter briefs discussing the effect, if any, of the court of appeals' decision upon the pending motions in this Court. Those briefs are at hand and have been considered.

In a demonstration of harmony virtually unprecedented in this litigation, counsel agree that the Second Circuit's decision in the bankruptcy case moots the Katzes' second ground for dismissal in 99 Civ. 0045, and the first ground in 01 Civ. 2739. This joint evaluation is clearly correct, and I will say nothing more about those bases for dismissal in this Opinion.

### III. DISCUSSION

#### A.  The Merits of Defendants' Motion to Dismiss the Second Amended Complaint in 99 Civ. 0045

The Katzes' motion to dismiss Feinberg's claim as an individual plaintiff is based upon the well-established principle of law that a shareholder in a corporation does not have standing to assert claims alleging wrongs to the corporation. *See. e.g., Jones v. Niagara Frontier Transporation Authority (NFTA)*, 836 F.2d 731, 736 (2d Cir. 1987) ("A shareholder -- even the sole shareholder -- does not have standing to assert claims alleging wrongs to the corporation" . . . even though the shareholder "may have faced the risk of financial loss as a result" (citing federal cases). New York courts apply the same rule. *See, e.g. Abrams v. Donati*, 66 N.Y.2d 951, 953 (1985) ("For a wrong against a corporation a shareholder has no individual cause of action, though he loses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation.")

(citations omitted), a rule that the New York Court of Appeals, like the Second Circuit in *Jones*, applies to closely held corporations, *see Glenn v. Hoteltron Systems, Inc.*, 74 N.Y.2d 386, 392-93 (1989); *see also Ginascio v. Giordano*, No. 99 Civ. 1796, 2003 WL 22999454 (S.D.N.Y. Dec. 19, 2003), at *6 ("Even a sole shareholder lacks standing to assert claims alleging a wrong to the corporation.") (citing *Jones* and *Abrams*). The Katzes say this principle applies to Feinberg's personal claims in 99 Civ. 0045 because "[a]ll of Feinberg's claims in the Second Amended Complaint . . . relate to misappropriations *from Alliance*." Main Brief at 11 (emphasis in original).

In response, Feinberg argues that he can take advantage of "the separate duty" exception to the rule that a shareholder lacks standing to assert the corporation's claim. *See Abrams*, 66 N.Y.2d at 953 ("Exceptions to that rule have been recognized when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged" (citations omitted). Feinberg contends principally that since the second amended complaint alleges at ¶12 that the Katzes "owed common law and statutory fiduciary obligations to Alliance *and to Feinberg* as a fellow officer and principal shareholder of the company" (emphasis added), the complaint adequately alleges a breach of a duty owing to Feinberg sufficient to bring his individual claim within the exception.

I do not agree. The Second Circuit has, in addition to the cases cited *supra*, consistently recognized and applied "the general principle that a shareholder cannot sue in his individual capacity to redress wrongs inflicted upon a corporation in which he holds stock." *Bingham v. Zolt*, 66 F.3d 553, 561 (2d Cir. 1995). For that proposition the *Bingham* court cited *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993), which is particularly instructive in the case at bar because it involved a civil RICO claim, just as Feinberg asserts a RICO claim against Stephen Katz.

8

There are other material similarities between *Manson* and the case at bar. Plaintiff David Manson was a fifty percent shareholder of the Stavola-Manson Electrical Construction Company, Inc., and also the president and one of two directors.[5] The other shareholder was defendant Anka Stacescu and the other director was defendant Jay Stavola. The Mansons filed a RICO action against a number of defendants, alleging acts that "were part of a scheme through which [defendants] looted the Company to the point of bankruptcy in order to enrich themselves." 11 F.3d at 1129. The district court held, *inter alia*, that David Manson "does not have standing either as a shareholder or as an employee of the Company," and also held that "the complaint did not allege a breach of fiduciary duty and denied the Mansons' motion for leave to amend their complaint specifically to allege such a breach." *Id*. at 1130-31. Thus *Manson* presents, as does the case at bar, a claim by one fifty percent shareholder of a closely held corporation against the other fifty percent shareholder and another defendant that they looted the corporation for their personal enrichment.

The district court dismissed the complaint in *Manson* for lack of standing by the plaintiffs. The Second Circuit affirmed. It is useful to quote the opinion at some length:

> The Mansons claim that David Manson has standing to sue as a fifty percent shareholder of the Company. A shareholder generally does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock. This is true even when the plaintiff is the sole shareholder of the injured corporation. Since the shareholder's injury, like that of the creditor, generally is derivative of the injury to the corporation, the shareholder's injury is not related directly to the defendant's injurious conduct.

11 F.3d at 1131. The court of appeals also affirmed the district court's denial of the Mansons' motion to amend their complaint to allege a breach of fiduciary duty on the part of certain

---

[5] There were two plaintiffs. The other was named Mark Manson. In its opinion the Second Circuit sometimes referred to them collectively as "the Mansons."

defendants:

> Even if the court had permitted the Mansons to amend their complaint to include such an allegation, David Manson would not have standing to assert a federal RICO claim. We recognized a special duty exception in the context of RICO actions in *Ceribelli v. Elghanayan*, 990 F.2d 62, 63-65 (2d Cir. 1993), but we suggested that exception is limited to cases in which the shareholder sustains an injury that is separate and distinct from the injury sustained by the corporation. . . . Since the Mansons do not allege that any appellee owed David Manson an independent duty that is distinguishable from the duty owed to the corporation, the special exception that we recognized in *Ceribelli* does not apply to this case.

> Furthermore, the Mansons cannot claim that any appellees owed David Manson a duty that was separate and distinct from the duty to the other shareholder. Courts have recognized an exception to the general rule of not recognizing a shareholder's individual claim where the injury sustained by the shareholder is separate and distinct from that sustained by other shareholders. Here, however, the other shareholder, Anca Stacescu, also sustained losses in the value of her shares. *Even though Stacescu is alleged to have participated in some of the wrongdoing*, she and David Manson have sustained the same injury with respect to the value of their shares and both would be made whole by a derivative action. . . . The Mansons essentially claim that the Company was looted, thereby causing the value of David Manson's shares to decline. Since there is no claim that David Manson sustained injuries that are distinct from those sustained by the corporation or the other shareholder, we hold that David Manson does not have standing as a shareholder.

*Id.* at 1131-32 (citations omitted) (emphasis added).[6] For comparable reasons, the Second Circuit held that David Manson's status as president and director of the corporation did not confer standing upon him to sue as an individual. *Id.*

*Manson* remains controlling authority in this circuit. *See, e.g., Lakonia Management Ltd. v. Meriwether*, 106 F.Supp. 2d 540, 551 (S.D.N.Y. 2000) ("It is a well-settled principle of corporate

---

[6] The emphasized phrase in the quotation from *Manson* is prompted by the fact that the defendants in the case at bar are also charged with wrongdoing.

law that an action to redress injuries to a corporation cannot be maintained by a shareholder in his [or her] name but must be brought in the name of the corporation through a derivative action. The principle applies with equal force to civil RICO claims." (citing *Manson*; other citations and internal quotation marks omitted)

*Manson*, closely similar on its facts to Feinberg's second amended complaint, whose core allegations are that Stephen Katz repeatedly (and Norman Katz on one occasion) looted I. Appel, controls this case. *Manson* explicitly rejects the theory that Feinberg relies upon for his personal claim: that the Katzes breached a fiduciary duty owing to him. I hold that Feinberg lacks standing to bring this action as an individual, either under RICO or the common law.

However, this holding does not result in dismissal of the complaint in 99 Civ. 0045. Feinberg also sues as the assignee of the company's claims against the Katzes. The Katzes' motion to dismiss argued that this assignment was invalid because of the company's asserted failure to disclose these claims in its bankruptcy proceeding, but as noted in Part II.C., *supra*, the Second Circuit's ruling in the bankruptcy case deprives the Katzes of that argument. Feinberg argued in his supplementary letter brief that "even if the claims were derivative -- which Feinberg contends they are not -- Feinberg, as the assignee of Appel, is entitled to any damages Appel could recover as against the defendants." Letter Brief at 2. For the reasons stated *supra*, I reject Feinberg's contention that his claims are not derivative; but the Katzes suggest no reason why the company's assignment to Feinberg is invalid, other than the one the Second Circuit has now foreclosed.

It follows that Feinberg cannot assert the claims alleged in this case as an individual, but he may do so as assignee of I.Appel/Alliance. Accordingly, the defendants' motion to dismiss the complaint in 99 Civ. 0045 will be granted as to Feinberg's claims as an individual, and denied as to

his claims as the assignee of the company.

**B.    The Merits of Defendants' Motion to Dismiss the Amended Complaint in 01 Civ. 2739**

It is important to note that while Feinberg sues as an assignee in both 99 Civ. 0045 and 01 Civ.

2739, in the former case he is the assignee of Alliance and in this case he is the assignee of Alliance's

unpaid creditors.[7]  As the assignee of Alliance's creditors, Feinberg stands in their shoes, and the case

must be analyzed from the creditors' perspective.  The salient feature of that perspective is that the

creditors loaned money to Alliance which was not repaid, or furnished goods or services to Alliance

for which they were not paid.

As discussed in Part II.C., *supra*, the Katzes' remaining grounds for dismissal are collateral

estoppel arising out of the arbitration; failure of the fraud claim for lack of materiality and damage

causation; and failure to adequately plead a RICO claim.  Because the last contention implicates the

Court's subject matter jurisdiction in ways that the others do not, I discuss it first.

**1.    *The Rico Claim***

The RICO statute, 18 U.S.C. §§ 1961-1968, gives the district courts subject matter jurisdiction

---

[7]  It would appear that the consideration for the assignment was the payment of "approximately $900,000 by Mr. Feinberg to the creditors, who in turn assigned [their claims] to Mr. Feinberg . . . " Plaintiff's Brief at 2.  This assertion is partially incorrect.  In point of fact, the assignment of the creditors' claims to Feinberg was made by Alliance, which had acquired these claims pursuant to the reorganization plan approved by the bankruptcy court.  Thus ¶ 9 of the amended complaint alleges that "[o]n or about June 1, 2000, pursuant to assignment and for valuable consideration, *Alliance* assigned the claims asserted herein to Herbert Feinberg . . . " (emphasis added).  *See also* fn.2, *supra*.

In these circumstances it cannot be said that the Alliance creditors assigned their claims directly to Feinberg, but rather by way of Alliance itself.  However, notwithstanding these procedural intricacies and a voyage including two ports of call, for the purpose of the analyses contained in this opinion the Alliance creditors may fairly be regarded as assignors of their claims to Feinberg and Feinberg as the assignee of those claims.  This Opinion is structured accordingly.

over civil actions by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Unlike the diversity statute, 28 U.S.C. § 1332, RICO has no requisite jurisdictional amount. Feinberg claims that the Katzes violated 18 U.S.C. § 1962(c). That subsection prohibits "any person employed by or associated with any enterprise . . . to conduct . . . such enterprise's affairs through a pattern of racketeering activity . . . "

Feinberg's amended complaint, for a second claim for relief, alleges at ¶ 75 that "the combination of defendants Stephen Katz and Norman Katz constitutes an association in fact and is an 'enterprise'" within the meaning of the RICO statute. ¶ 78 alleges that the Katzes participated in a "pattern of racketeering activity" by "knowingly disseminating false information in order to obtain finances and meeting with suppliers, lenders and credit reporting agencies in order to provide false information and a false sense of respectability." ¶ 79 alleges:

> The relationship between the enterprise and the pattern of racketeering activity is that the structure and activities of the enterprise, consisting of a director, principal shareholder and officers of Alliance, created the opportunity for the enterprise to engage in the racketeering activity by inducing lenders and suppliers to extend credit to Alliance upon fraudulent financial statements which vastly overstated Alliance's financial condition . . .

¶ 80 alleges that as a result of these violations of § 1962(c)[8] "Alliance's creditors advanced in excess of $3,890,441.68 which Alliance was unable to repay before filing for bankruptcy protection." This is the total of the amounts Alliance failed to pay 70 separate creditors, listed in an appendix to the complaint. Feinberg's RICO claim seeks treble damages in accordance with that subsection of the RICO statute.

The Katzes challenge the sufficiency of Feinberg's RICO pleading on a number of grounds.

---

[8] The RICO predicate acts alleged in the complaint are mail fraud and wire fraud. ¶ 70.

They contend, *inter alia*, that the requirement that the "person" and the "enterprise" contemplated by § 1962(c) be distinct is not demonstrated by the amended complaint, and in the circumstances of the case could never be. In that contention, the Katzes are correct.

The Second Circuit has repeatedly held that § 1962(c) "clearly envisions" that the "person" and the "enterprise" will be distinct. *Bennett v. United States Trust Co.*, 770 F.2d 308, 315 (2d Cir. 1985), *cert. denied*, 474 U.S. 1058 (1986). In *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339 (2d Cir. 1994), the Second Circuit explained further that the distinctiveness requirement of *Bennett* may not be circumvented "by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant," and that "[w]here employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation." *Id.* At 344. In the later case of *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055 (2d Cir. 1996), the Second Circuit said: "Thus, in *Riverwoods*, we found that the activities of two loan officers 'acting within the scope of their authority' could not subject them to RICO liability for conducting the affairs of the alleged enterprise-bank." Id at 1063. *Discon* held that the distinctiveness requirement of *Bennett* was not satisfied where a group of corporate defendants operated "within a unified corporate structure." *Id.* at 1064. Analogizing those defendants to the bank loan officers in *Riverwoods*, the *Discon* court said: "In both cases, the individual defendants were acting within the scope of a single corporate structure, guided by a single corporate consciousness." *Id.*

These Second Circuit decisions apply to the case at bar and require dismissal of Feinberg's RICO claim. I reiterate: Feinberg asserts this claim as assignee of Alliance's creditors. The RICO

14

claim must be viewed through the prism of the creditors' relationship with Alliance and the Katzes. The creditors loaned money or furnished services to Alliance, not to Stephen or Norman Katz. If the creditors were victims of mail fraud or wire fraud, that fraud was perpetrated by the Katzes in the course of their employment by Alliance and for the benefit of Alliance. Given the cited Second Circuit authority, it cannot be said that, in such circumstances, the requisite distinctiveness between the "person" and the "enterprise" exists.

This analysis is not affected by the fact that Feinberg did not name Alliance as a defendant. Perhaps the omission is not surprising; Feinberg now owns the company, and Alliance has passed though a bankruptcy proceeding. But the absence of Alliance as a defendant does not alter the circumstances in which the creditors' claims came into being, and Feinberg as assignee stands in the creditors' shoes. The creditors dealt with Alliance, and the losses they suffered were caused by Alliance's failure to pay what the company owed them. The creditors were defrauded, the complaint alleges, by the conduct of the Katzes, while acting within the scope of their employment by or as control persons of Alliance, for the benefit of Alliance. This case falls within the rationales of *Riverwoods* and *Discon*, notwithstanding the absence of Alliance as a defendant.

It follows that Feinberg's RICO claim as assignee of the creditors must be dismissed. The brief for Feinberg on this motion contained a request for leave to amend the complaint if the Court regarded the RICO claim as deficient. I deny leave to amend, because on the facts of the case I am unable to discern any manner in which the distinctiveness requirement could be adequately pleaded.[9]

---

[9] Defendants; brief advances additional and separate reasons why Feinberg's RICO claim should be dismissed. In the view I take of the case, I need not reach those issues.

**2.** *Subject Matter Jurisdiction*

**(a).** **Diversity Jurisdiction**

The dismissal of Feinberg's RICO claim impacts upon this Court's subject matter jurisdiction, since diversity of citizenship is the only remaining basis asserted for jurisdiction,[10] and the diversity statute requires that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a). Of the 70 separate creditor-assignors listed in the attachment to the complaint, six have claims against Alliance exceeding $75,000. The claims of each of the remaining 64 are less than $75,000.

The briefs of counsel raise two questions: (1) can the 70 claims be aggregated for purposes of satisfying the jurisdictional amount as to all of them; and (2) if not, can and should the Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the claims for less than $75,000? 7(c)?

The Katzes contend that the claims cannot be aggregated and rely principally upon *Zahn v. International Paper Co.*, 414 U.S. 291 (1974), a putative class action, where the Court held that "[e]ach plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case -- one plaintiff may not ride on another's coattails." *Id.* at 301 (citation and internal quotation marks omitted).

Feinberg responds that the case at bar is not a class action and consequently *Zahn* does not apply. This reads Supreme Court jurisprudence too narrowly. The *Zahn* Court, citing *Snyder v. Harris*, 394 U.S. 332 (1969), held that "the rationale of that case controls this one," 414 U.S. at 300,

---

[10] The amended complaint alleges that Feinberg is a "resident" of New York and the Katzes are "residents" of Connecticut. ¶¶ 9, 10. Allegations of residence are not sufficient to plead diversity, since the citizenship of an individual depends upon domicile; one can have more than one residence but only one state of domicile. I will assume for the purpose of this Opinion that Feinberg could make a further showing sufficient to demonstrate diversity of citizenship.

and went on to say:

> *Snyder* invoked the well-established rule that each of several plaintiffs asserting separate and distinct claims must satisfy the jurisdictional-amount requirement if his claim is to survive a motion to dismiss. This rule plainly mandates not only that there may be no aggregation and that the entire case must be dismissed where none of the plaintiffs claims more than $10,000 but also requires that any plaintiff without the jurisdictional amount must be dismissed from the case, even though others allege jurisdictionally sufficient claims.

*Id.*[11] Moreover, the rule declared in *Snyder* applies to both class and non-class actions, as the Second Circuit recognized in *Mehlenbacher v. Akzo Nobel Salt Co.*, 216 F.3d 291, 296 (2d Cir. 2000):

> The Supreme Court has long held that separate and distinct claims raised by different plaintiffs may not be aggregated to satisfy the jurisdictional amount in controversy. *See Snyder*, 394 U.S. at 336, 89 S.Ct. 1053. And, in *Snyder*, the Court reaffirmed that the same rule applies to class actions.

(footnote omitted). Thus it is entirely clear that if the 70 Alliance creditors invoked diversity jurisdiction to sue the Katzes in a single action, by joinder of parties under Rule 20, Fed. R. Civ. P., or as members of a class under Rule 23, only those with claims of $75,000 or more could establish original diversity jurisdiction and the others would be dismissed from the action, unless the district court exercised supplemental jurisdiction over the lesser claims.[12]

However, the creditors are not suing the Katzes. They all assigned their claims to Feinberg, for a seemingly adequate consideration, and Feinberg is the sole plaintiff. The question that arises, which the briefs of counsel do not squarely address, is whether the single assignee of a number of

---

[11] The $10,000 amount referred to in *Zahn* reflects the requisite jurisdictional amount for diversity jurisdiction at that time.

[12] The question of supplemental jurisdiction in the case at bar is discussed in Part III.B.2.b., *infra*.

claims may aggregate them in such a way as to establish diversity jurisdiction for all the claims, even if some or all of them are not for the jurisdictional amount.

28 U.S.C. § 1359 provides: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." This statutory language would seem by implication to give its blessing to assignments *not* collusively made to invoke federal jurisdiction. A number of courts have so held. Thus in *Long & Foster Real Estate, Inc. v. NRT Mid-Atlantic*, 357 F.Supp.2d 911 (E.D.Va. 2005), a brokerage firm paid individual brokers commissions that its predecessor firm wrongfully failed to pay, accepted assignments from the brokers in which "the agents retained no residual interest in the assigned claims," *id.* at 914, and sued the predecessor firm for the commissions in federal court, invoking the court's diversity jurisdiction. The district court held that, in the absence of evidence of collusion, the plaintiff "may properly assert all of its assigned claims in this forum and may also aggregate the claims to meet the jurisdictional amount in controversy requirement." *Id.* at 921. Aggregation of claims was essential to federal jurisdiction in *Long & Foster*, because, as the court noted, the plaintiff "seeks a total of $423,484.09 from NRT in this action, which amount is comprised of numerous smaller claims, *each of which is individually below the jurisdictional amount in controversy.*" *Id.* at 920 (emphasis added).

Closer to home, in *Boston Post Road Medical Imaging, P.C. v. Allstate Insurance Co.*, 2004 WL 830154, No. 03 Civ. 6150 (S.D.N.Y. Apr. 13, 2004), the plaintiff sued in its capacity as assignee of 44 patients who assigned their no-fault insurance benefits to plaintiff in exchange for medical services the plaintiff rendered to them. Plaintiff sued in this Court, alleging diversity jurisdiction. Denying defendant's motion to dismiss the complaint, Judge Scheindlin held, first, that the plaintiff

was the real party in interest because it "owns the claims in issue and if it is not successful in this action, it will not be compensated for the service it provided," so that "[a]s an assignee, Boston Post is the only plaintiff that has an interest in recovering monies allegedly owed by Allstate," *id.*, at *2; and, second, that the aggregation of claims was permissible to establish the jurisdictional amount because Rule 18(a) allows a single plaintiff to aggregate claims and "the assignments in issue do not appear to have been made *solely* to manufacture diversity jurisdiction" and accordingly were not collusive, *id.* at *3-*4 (emphasis added).[13]

In *Deajess Medical Imaging, P.C. v. Allstate Insurance Co.*, 381 F.Supp.2d 307 (S.D.N.Y. 2005), which arose on similar facts, Judge Sprizzo agreed with Judge Scheindlin's two quoted holdings in *Boston Post Road*, but nonetheless concluded that the action was barred by 28 U.S.C. § 1359's invalidation of an assignment "that has been *improperly* or collusively made. . . to invoke the jurisdiction" of a federal court (emphasis added). Judge Sprizzo reasoned that although the assignments were not collusive, they were improper because "[p]laintiffs' conduct, specifically joining together separate and unrelated controversies as the mechanism by which to wedge their way into a federal forum, should not be countenanced." *Id.* at 312. This last circumstance does not apply to the case at bar, since while in *Deajass* the defendant insurers "denied payment on each separate claim for distinct reasons," *id.* at 309, the Allied creditor-assignors are alleged to have been victims

---

[13] In concluding that the assignments were not collusive, Judge Schiendlin noted that "the assignors have no interest in plaintiff's recovery, nor do they control any aspect of this litigation," the assignments were made "well before the commencement of this litigation," the consideration for the assignments was adequate, and plaintiff's business purpose for accepting them "is reasonable and does not appear to be pretextual." 2004 WL 830154, at *3.

of the same fraud perpetrated by the Katzes.[14]

The leading Supreme Court case on the collusiveness of assignments is *Kramer v. Carribbean Mills, Inc.*, 394 U.S. 823 (1969), in which the Court employed a totality of circumstances analysis in concluding that the assignments in question were "a mere contrivance, a pretense, the result of a collusive arrangement to create federal jurisdiction" and consequently violative of 28 U.S.C. § 1359. *Id.* at 827 (citation and internal quotation marks omitted). Since *Kramer*, courts have considered a variety of factors in the § 1359 "totality of the circumstances" analysis, including whether there was minimal or no consideration involved in the assignment; whether the assignee had any previous connection to the assigned claim; whether there was a legitimate business reason for the assignment; whether the timing of the assignment suggests that it was merely an effort to secure federal jurisdiction; whether the assignor exercises any control over the conduct of the litigation; and whether the assignor retains any interest in the action, such as receiving a percentage of the assignee's recovery. *See Logan & Foster*, 357 F.Supp.2d at 922-23 (citing cases). The Supreme Court in *Kramer* indicated that an assignor's abandonment of any interest in the claim was of particular significance; it noted pointedly that "we have no occasion to re-examine the cases in which this Court has held that where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then the transfer is not 'improperly or collusively made,' regardless of the transferor's motive." 394 U.S. at 828 n.9 (citing cases). In the case at bar, the Alliance creditors' assignments

---

[14] In his opinion in *Deajess*, Judge Sprizzo noted that other judges of this Court had held, disagreeing with Judge Schiendlin and Judge Sprizzo on the point, that assigned claims could not be aggregated in order to create the required diversity jurisdiction amount where none of the individual claims satisfies the amount in controversy. 381 F.Supp.2d at 309-310 (collecting cases). With due respect to all concerned, I am free to choose between these conflicting decisions, and conclude that Judges Scheindlin and Sprizzo are right.

to Feinberg were absolute.

If the case at bar turned upon the point, I would hold that the creditors' assignments to Feinberg were not collusive and the amounts of those claims could be aggregated to establish the requisite jurisdictional amount. But I need not pursue the question further because it is clear that, in any event, this Court has supplemental jurisdiction over the assigned claims which do not reach the jurisdictional amount.

**(b). Supplemental Jurisdiction**

Congress enacted 28 U.S.C. § 1367 as part of the Judicial Improvements Act of 1990. As long as a federal district court has original jurisdiction of a claim, § 1367(a) dictates that the court

> shall have jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

"The conferral is in mandatory terms -- the court 'shall' have the supplemental jurisdiction -- but subdivision (c) . . . gives the court discretion to 'decline to exercise' the supplemental jurisdiction in various circumstances." David D. Siegel, *Practice Commentary* to § 1367 (West 1993) at 831 (hereinafter "Siegel").

In addition to these provisions, § 1367(b) provides that in a case where the district courts' original jurisdiction is "founded solely on section 1332 of this title" (*i.e.*, the diversity statute), the courts "shall not have supplemental jurisdiction under subsection (a) over claims made under Rule 14, 19, 20 or 24, Fed. R. Civ. P., "when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332." "But note that subdivision (b) carves out only specific instances in which it excludes the supplemental jurisdiction in diversity cases.

By no means does it exclude it from diversity cases in general." Siegel at 832. The case at bar does not fall within any of the specific exclusions of supplemental jurisdiction found in § 1367(b).

As noted *supra*, six of the Alliance creditor-assignors had claims satisfying the jurisdictional amount. Accordingly this Court has original jurisdiction over those six claims. The Katzes concede this to be so. The question that arises is whether § 1367 authorizes supplemental jurisdiction over the other 64 claims which do not reach the jurisdictional amount. Feinberg says that it does. The Katzes say it does not, or, in the alternative, the Court should decline to exercise that supplemental jurisdiction under § 1367(c).

Four months ago, in *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 125 S.Ct. 2611 (2005), the Supreme Court resolved these issues in Feinberg's favor. The question in *Exxon* and the Court's answer are stated in the opening paragraphs of Justice Kennedy's opinion:

> These consolidated cases present the question whether a federal court in a diversity action may exercise supplemental jurisdiction over additional plaintiffs whose claims do not satisfy the minimum amount-in-controversy requirement, provided the claims are part of the same case or controversy as the claims of plaintiffs who do allege a sufficient amount in controversy. Our decision turns on the correct interpretation of 28 U.S.C. § 1367. . . .
>
> We hold that, where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies the amount-in-controversy requirement, § 1367 does authorize supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the jurisdictional amount specified in the statute setting forth the requirements for diversity jurisdiction.

125 S.Ct. at 2615.

Two observations may be made about the Court's holding. First, it applies both to class

actions and multi-plaintiff cases where no class has been certified.[15]  Second, the rationale applied by the *Exxon* Court to supplemental jurisdiction in multi-plaintiff diversity actions, whether class certified or not, extends *a fortiori* to the case at bar, where a single plaintiff holds valid and absolute assignments from a number of creditor-assignors.

There is no merit to the Katzes' alternative argument that this Court should decline to exercise supplemental jurisdiction "over the claims of 64 creditors on the basis of diversity jurisdiction over the claims of only six creditors." Brief at 10. The Katzes rely upon §1367(c)(2). § 1367(c) provides that the district courts "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if -- . . . (2) the claim substantially predominates over the claim or claims over which the court has original jurisdiction." The first and second clauses of § 1367(c) "overlap the so-called caselaw-based 'abstention' doctrines, under which a federal court can stay or dismiss a claim with heavy state law elements." Siegel at 834. Clause (c)(2) addresses a case where "a state claim dependent on supplemental jurisdiction may be found to predominate over the federal claim that supports the jurisdiction," leading to what used to be known as a *"Burford"* abstention, *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). *Id.* at 835. In *Burford* the Supreme Court held that a federal district court sitting in equity properly refused to take jurisdiction of a diversity suit to enjoin enforcement

---

[15]  The Supreme Court granted certiorari in *Exxon* to resolve a conflict between the Eighth and First Circuits. The Eighth Circuit had held that "§ 1367 clearly and unambiguously provides district courts with the authority in diversity class actions to exercise supplementary jurisdiction over the claims of class members who do not meet the minimum amount in controversy as long as the district court has original jurisdiction over the claims of at least one of the class representatives." *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1256 (8th Cir. 2003). The Supreme Court affirmed. The First Circuit held that in a personal injury case involving several family member plaintiffs, § 1367 authorizes supplemental jurisdiction only when the district court has original jurisdiction over the action, and that in a diversity case original jurisdiction is lacking if one plaintiff fails to satisfy the amount-in-controversy requirement. *Ortega v. Star-Kist Foods, Inc.*, 370 F.3d 124 (1st Cir. 2004). The Supreme Court reversed.

of an order of the Texas Railroad Commission granting permits to drill oil wells, where the relevant Texas statute provided a unified method for formation of policy regarding the oil industry and expeditious and adequate judicial review in state courts of regulatory orders. The purpose underlying § 1367(c)(2) has nothing to do with the case at bar, where the claims of all the Alliance creditor-assignors depend upon the same core allegations that the Katzes defrauded them. No separate state case law, policies or concerns "predominate" so as to complicate or be compromised by this Court's resolution of all the claims.

For the foregoing reasons, the defendants' motion to dismiss the complaint in 01 Civ. 2739 for lack of subject matter jurisdiction over Feinberg's RICO claim will be granted, and their motion to dismiss his claims for lack of subject matter jurisdiction based upon diversity of citizenship will be denied.

## C.  Other Issues

### 1.  *Collateral Estoppel*

The Katzes argue on this motion that "Feinberg's claims with respect to the 1995 Financials [of I. Appel] are barred by collateral estoppel," since they "directly implicate[] an issue that was litigated and decided in the Arbitration -- the accuracy of the 1995 Financials." Main Brief at 14. This is the arbitration described in Part I, *supra,* between Feinberg and Norman Katz, in which the arbitrators rendered their award on November 22, 1999. An evaluation of this argument requires analysis of the award and the amended complaint. I begin with the latter.

### (a).  The Amended Complaint

The core purpose ascribed by the amended complaint in 01 Civ. 2739 to the Katzes was "to obtain financing under false pretenses and provide a fictitious basis for overstating Alliance's financial

24

condition so as to induce its suppliers to sell to the company on credit and its factors to extend credit and forbear from exercising any remedies they night have to protect their own interests." Amended Complaint, ¶ 2. To this end, "[o]ver the years, the Katzes repeatedly disseminated, or caused to be disseminated, patently false financials statements," combining together "in a concerted effort to conceal the company's true financial picture to its creditors." *Id.*

The complaint lays particular stress upon the company's 1994 and 1995 financial statements. It alleges in ¶ 32 that "[i]n April, May and June 1995, Norman and Stephen Katz transmitted via United States Mail Alliance's certified financial statement for the period ended December 31, 1994 with an unqualified opinion (the '1994 Financial Statement') to various creditors or reporting agencies." ¶ 33 alleges that "the 1994 Financial Statement contained numerous material deliberate misstatements and omissions by Norman and Stephen Katz, " and goes on to give examples.

¶ 35 of the amended complaint alleges that "between May 10 and 16, 1996, Norman Katz transmitted Alliance's financial statements for the period ended December 31, 1995, again with an unqualified opinion (the '1995 Financial Statement') via the United States Mails to various creditors, banks, factors, and credit reporting agencies of Alliance . . . " A separate and subsequent ¶ 35[16] alleges in its entirety:

> The 1995 Financial Statements were materially false and misleading because of, among other things: overstating the value of Alliance's inventory, misstating the methodology for determining inventory valuation, overstating the amount of shareholder equity, failing to disclose certain liabilities of the Company, overstating the value of various Company assets, failing to provide adequate reserves for various material events affecting the Company, and through other

---

[16] In an apparent word processor glitch, undetected by counsel, the paragraphs in the amended complaint are numbered "33, 34, 35, 36, 35, 36, 37," and so on, without further numerical peculiarities.

material misstatements and omissions.

Various defects with respect to the 1995 financial statements are alleged in subsequent paragraphs.

**(b).    The Arbitration Award**

The 39-page arbitration award dated November 22, 1999 (the "award") is attached as Ex. B to the declaration of Ronald C. Minkoff. The award was preceded by lengthy hearings before a panel of three arbitrators and related proceedings.[17] Feinberg sought in the arbitration, *inter alia*, a rescission of his agreement with Katz to purchase Katz's 50 percent interest in the company and money damages. Feinberg claimed that "Katz fraudulently induced him to execute the Purchase Agreement by falsely inflating I. Appel's net worth as stated in its 1995 audited financial statements . . . " Award at 2. Specifically, Feinberg's claims

> focused principally on his alleged reliance on the 1995 Financials and on Katz's budget projections for 1996 in entering into the Purchase Agreement . . . . Feinberg alleges that Katz manipulated I. Appel's raw material values through false representations to the Company Accountants with respect to the usability of the inventory and failed to provide Mahoney, Cohen [the company accountants] with accurate aging and other information relevant to inventory valuation, including the fact that several divisions had been shut down rendering their inventory substantially unuseable. As a result, Feinberg claims the 1995 Financials materially overstated I. Appel's net worth as of December 31, 1995.

*Id.* at 15-16.

The arbitrators rejected Feinberg's claims for rescission and damages for two reasons. First,

---

[17] Discovery extended for a period of more than eighteen months and continued during the hearing. Thirty-four depositions were taken and the transcripts of most of the deponents admitted into the arbitral record. Sixteen witnesses testified before the arbitrators. The testimony and arguments of counsel generated almost 5,400 pages of transcripts. More than 1,450 exhibits, comprising "many thousands of pages of documents," were received into evidence. Award at 5.

they concluded that "[t]he evidence demonstrates that Feinberg did not rely on the 1995 Financials and the valuation of inventory they contained or on Katz's 1996 budget projections in deciding to proceed with the Purchase Agreement . . . " Award at 16. After a detailed review of the record, the arbitrators concluded:

> Based on the foregoing and other evidence in the record, the Tribunal does not accept Feinberg's testimony that he relied on the 1995 Financials in entering into the Purchase Agreement . . . Given his knowledge and sophistication, to the extent Feinberg may have so relied, such reliance was not reasonable.

*Id.* at 19-20. These conclusions were fatal to Feinberg's fraud and rescission claims against Norman Katz, since reasonable reliance upon allegedly fraudulent utterances or documents is an essential element of a cause of action for fraud.

If the arbitrators had stopped there, no basis for collateral estoppel would be present in the case at bar. Feinberg as the assignee of the company's creditors, who furnished funds, goods or services to the company, is conceptually different from the knowledgeable and sophisticated Feinberg negotiating with Norman Katz for the purchase of the company, since his unreasonable reliance in protecting his own interests cannot be imputed to the creditor-assignors in derogation of their claims.

However, the arbitrators went on and rejected Feinberg's claims for a second reason: the 1995 Financials were not false to begin with. I will quote again from the Award:

> Feinberg has not proven that the 1955 Financials were "false" for purposes of a fraud claim. The most that can fairly be said from the evidence is that the value placed on the inventory in the 1955 Financials and the value placed in the [Final Share Purchase Price] Determination were markedly different. That stems at least in part, if not in large measure, from the employment of a novel "O-C-U" valuation process in the Determination that had never been utilized before by the Company.

The evidence also failed to demonstrate that Katz was responsible for the inventory valuation contained in the 1995 Financials. That determination was made by Mahoney, Cohen, the Company Accountants, in its customary fashion under the direction and control of the long-time account partner, Robert Feinman ("Feinman"). Although Feinman saw Katz's inventory-related figures, he testified that he did not rely on them. Mahoney, Cohen also tested its inventory determinations during the audit. While Katz obviously had significant input, the evidence does not establish that he controlled the process in a way to dictate the outcome.

In this regard, it is significant that when faced with this enormous discrepancy in inventory valuation between the 1995 audit and the 1996 FSPP Determination, Mahoney, Cohen reaffirmed its view that the 1995 Financials accurately reflected the financial condition of the company. Mahoney, Cohen did not restate the 1995 Financials even after coming to the substantially reduced inventory valuation as of May 31, 1996. The parties' accounting experts agreed that Mahoney, Cohen would have been required to restate the financials under GAAP, if it had believed the 1995 Financials to be incorrect. . . .

The manner in which the inventory was valued and audited for purposes of the 1995 Financials was consistent with the methodology that had been utilized throughout the life of the Company. The personnel involved in the 1995 audit were those involved in the audits for earlier years. . . . If the methodology utilized for the 1995 Financials was flawed, including Norman Katz's involvement, then presumably the financials in earlier years were flawed as regards inventory. Yet there is no evidence that the valuation of inventory in any of those earlier years turned out to be incorrect, overstated or caused any adverse consequences for the Company. . . .

Of particular importance where fraud is alleged, Feinberg has not shown by clear and convincing evidence that Katz intentionally or knowingly misrepresented the value of the inventory. He may have been badly mistaken regarding the usability of the older inventory. It appears from the evidence, however, that based on his many years of experience in the industry and with I. Appel and this very kind of inventory, that the inventory could, at least in his view, still be used for finished goods that would provide value to the Company.

The Katzes argue that as the result of this arbitration award, "Feinberg's claims with respect

to the 1995 Financials are barred by collateral estoppel." Main Brief at 14. I agree that collateral estoppel applies, but not to the extent for which the Katzes contend.

It is well established that an arbitration award may serve as the basis for collateral estoppel in subsequent litigation. Where, as in the case at bar, a federal district court's jurisdiction rests on diversity, the court looks to the law of the state where it sits "on the collateral estoppel effect of an arbitration award." *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997) (considering whether a prior arbitration award had collateral estoppel effect in subsequent litigation). I must therefore look to New York law, which the Second Circuit summarized in *BBS Norwalk One*:

> Under New York law, in order to invoke the doctrine of collateral estoppel, a party must show that the identical issue necessarily must have been decided in the prior action and be decisive of the present action. The party invoking collateral estoppel bears the burden of proving the identity of the issues. The prior decision need not have been explicit on the point, since if by necessary implication it is contained in that which has been explicitly decided, it will be the basis for collateral estoppel. Nonetheless, the party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment, so that issue preclusion will apply only if it is quite clear that this requirement has been met.

117 F.3d at 677 (citations and internal quotation marks omitted). The Second Circuit remanded the case to the district court to develop a more clear record as to what issues the arbitrator had decided in arriving at an award which gave no reasons for the result.

In the present case, the detailed, lengthy and clearly expressed award of the arbitrators makes two facts crystal clear: first, Feinberg failed to prove the 1995 Financials were false in respect of the valuation of I. Appel's inventory; and second, inventory valuation was the only basis for Feinberg's claims that the Financials were fraudulently false and Norman Katz participated in the fraud. However, ¶ 35 of the amended complaint, quoted *supra*, alleges that the 1995 Financials were

29

materially false and misleading in a number of ways, of which inventory valuation was only one.

It follows that in the present action, Feinberg will be estopped from claiming (1) that the I. Appeal 1995 financial statements were false or fraudulent with respect to their valuation of the company's inventory, and (2) that Norman Katz acted fraudulently in determining or stating, directly or indirectly, the inventory valuations appearing in the 1995 financials. The collateral estoppel effect of the arbitration award is limited to inventory valuation because the award makes it clear that this was the only issue the arbitrators decided. The other claims of fraud alleged by the complaint with respect to the 1995 financial statements are different in nature and design and, given the precision of the award, there is no basis for concluding that the arbitrators' explicit and limited decision rejecting one fraud claim contains within it the necessary implication that the arbitrators also rejected other claims which, judging by the award, Feinberg did not raise and the award does not discuss. Any other claims arising out of the 1995 financial statements are not barred by collateral estoppel; nor, of course, are claims by Feinberg of wrongdoing by the Katzes which have nothing to do with the 1995 financial statements. .[18]

## 2. *The Materiality of the Alleged Misappropriation by Stephen Katz of Company Assets*

At ¶¶ 42-60 of the amended complaint, under the caption "The Katzes' Fraudulent

---

[18] For collateral estoppel analysis, Feinberg as assignee of the creditors' claims is in privity with Feinberg as individual claimant in the arbitration. That is so even if, stretching reality, Feinberg in his present incarnation as assignee were regarded as a nonparty to the arbitration. The doctrine of privity extends the preclusive effect of a prior judgment or arbitration award "to nonparties who are in privity with the parties to the first action. . . . Privity represents a legal conclusion that the relationship between the parties is sufficiently close to support preclusion." *Amalgamated Sugar Co., LLC v. NL Industries, Inc.*, 825 F.2d 634, 640 (2d Cir. 1987). That conclusion of sufficient proximity is clearly warranted where Feinberg, as the result of the creditors' absolute assignments, is the only party standing to gain from this litigation, just as he was in the arbitration.

Conveyance Scheme," Feinberg alleges that "during a period of many years prior to July 1, 1996, both Stephen and Norman Katz conspired to systematically misappropriate and convert substantial funds and assets belonging to Alliance." ¶ 42. This alleged scheme consisted principally of Stephen Katz siphoning off money from the company for his personal use by means of dummy invoices "which purported to be genuine invoices from Alliance's suppliers." ¶ 45. Stephen then funneled the company's payments of these dummy invoices into his own bank accounts. The allegations describing this scheme underlie Feinberg's third, fourth, and fifth claims for relief, for breach of fiduciary duty, constructive fraud, and fraudulent conveyance. The amount prayed for in damages on each of these claims is $250,000, that apparently being the approximate total of the misappropriations presently known to or suspected by Feinberg.

In addressing the fraud claims based upon this misappropriation scheme, the Katzes' motion argues principally that the requisite elements of materiality and causation are not sufficiently alleged. *See Bermuda Container Line, Ltd. v. International Longshoremen's Association, AFL-CIO*, 192 F.3d 250, 258 (2d Cir. 1999) ("To state a claim for fraudulent concealment a plaintiff must show (1) that the defendant failed to disclose material information that he had a duty to disclose, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." (citing New York cases) (citations and internal quotation marks omitted). In the present posture of the case, the role of "the plaintiff" is played by the creditor-assignors. In support of their argument, the Katzes say that "crucially, the alleged misappropriations did not materially impact these financial statements, because even Feinberg admits that the misappropriations appeared on Alliance's books as expense items," so that "the alleged concealment of the misappropriations did not enhance Alliance's financial picture: the

31

cash flow, profit and loss, and total asset figures on Alliance's financial statements remained the same, leaving the basis for the creditors' financing decisions unaffected." Main Brief at 19.

This argument may have a surface appeal, but it does not withstand analysis. Conceding Feinberg's allegations for the sake of that argument, the Katzes are saying that since some $250,000 Stephen Katz looted from I.Appel was carried falsely on the company books as legitimate expenses, so that the bottom line remained the same, the defendants did not fail to disclose a material fact (Stephen's misappropriations) to the company's creditors and the creditors' losses were not caused by that failure to disclose. Stripped of *politesse,* the Katzes' argument poses this question: would it have been of interest to I. Appel's creditors to know at the time they were negotiating with the company's officers about funding the company's operations or furnishing the company with goods or services, no doubt being encouraged to believe that the company was well and honestly run, that a company insider, quite possibly with the knowledge of his father and a 50% owner of the company, was misappropriating substantial sums from the company's coffers and concealing those misappropriations with dummy invoices in order to carry the amounts as false expense items on the company books?

The question answers itself, and for the purpose of testing the sufficiency of the pleading satisfies both the materiality and the causation elements. As for materiality, I may borrow from securities law and the Securities Exchange Act of 1934:

> To fulfill the materiality requirement under § 10(b), there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

*Starr v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005). This standard may be

applied to the I. Appel creditors who, by their funding or furnishing of goods and services on credit, were in effect investing in the company. It seems likely that the creditors would have been less inclined to do so if they knew that Stephen Katz was fraudulently misappropriating the company's assets and the company was apparently unable or unwilling to control him.[19] On that premise, the omission was material.[20] And, in possession of such knowledge, it is reasonable to infer that at least some creditors would have refrained from allowing the company to run up debts which thereafter the creditors could not collect. On that premise, the omission caused the loss.

What the proof at trial will be remains to be seen. While there are exceptions, questions of materiality and causation, with their fact-specific components, are more often and more properly decided by courts on a motion for summary judgment after full discovery, or by a jury after a plenary trial. I will deny the defendants' motion for an order declaring the allegations of the amended complaint in respect of Stephen Katz's misappropriations insufficient as a matter of law.

---

[19] I remind the reader, probably unnecessarily, that this opinion does no more than address the sufficiency of Feinberg's pleading. No facts have as yet been proven.

[20] In commercial transactions a failure to disclose particular conduct may be material if it bears upon an individual's character. *See Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 154 (2d Cir. 1995) (while district court properly considered plaintiff's contention that an individual's failure to disclose a real estate co-sponsorship was material because "critical to its evaluation of Marceca's 'character and capacity,'" the court of appeals concluded that "we cannot see how the co-sponsorship issue would materially impact Banque Arabe's assessment of Mr. Marceca." Presumably disclosure to the Alliance creditors of Stephen Katz's looting the company and falsifying its books would impact the creditors' assessment of both Katzes.

## IV. CONCLUSION

For the foregoing reasons, the Court decides the defendants' motions as follows:

**In Case No. 99 Civ. 0045:**

1. Defendants' motion to dismiss plaintiff's claims in his individual capacity is granted.

2. Defendants' motion to dismiss plaintiff's claims as assignee of I.Appel/Alliance is denied.

**In Case No. 01 Civ. 2739:**

1. Defendants' motion to dismiss the amended complaint's second claim for relief, based upon the RICO statute, is granted.

2. Defendants' motion to bar certain of plaintiff's claims on the basis of collateral estoppel is granted with respect to claims that the I. Appel 1995 Financial Statements were false because of inventory valuation, and denied in all other respects.

3. The balance of defendants' motion to dismiss the amended complaint, in whole or in part, on other grounds is denied.

In consequence of the foregoing, the stay of pre-trial discovery is hereby vacated. The case will be returned to the assigned Magistrate Judge for further supervision, with the request that the cases be made ready for trial as early in 2006 as the circumstances will allow.

It is SO ORDERED.

DATED: New York, New York
November 3, 2005

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

34